IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FREDDIE D. MATTHEWS                                                    PLAINTIFF

v.                        Civil No. 06-5064

OFFICER K. HILL; and
OFFICER M. DUNHAM                                                    DEFENDANTS

## MEMORANDUM OPINION

Plaintiff filed this civil rights case pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis.* Plaintiff contends his constitutional rights were violated when the defendants used excessive force against him on March 11, 2006, while he was a detainee at the Washington County Detention Center.

Defendants have filed motions for summary judgment (Doc. 33 and Doc. 45). Plaintiff responded to the motions (Doc. 42 and Doc. 46). Plaintiff, however, also filed a motion (Doc. 48) asking that the court assist him in responding to the summary judgment motions by propounding a questionnaire. The motion (Doc. 48) for a questionnaire was granted and a questionnaire propounded (Doc. 50). Plaintiff responded to the questionnaire (Doc. 51). Pursuant to the consent of the parties (Doc. 44) the motions are now before the undersigned for decision.

## Background

Warrant #110103 was issued on February 28, 2006, for Matthews' arrest after he violated the terms of his parole. *Plaintiff's Response* (Doc. 51) (hereinafter *Resp.*) at ¶ 1. On February 28th, Matthews was booked into the Washington County Detention Center (WCDC) on a parole

-1-

violation charge, and on charges of domestic battery, terroristic threatening, criminal mischief, and endangering the welfare of a minor. *Id.* at ¶ 2.

As part of the booking process, Matthews completed a medical questionnaire. *Resp.* at ¶ 3.  He indicated he had been treated for mental illness and depression, was currently under a doctor's care, took trazadone for mental illness, and was seeing a doctor in prison. *Id.*  He signed a medical release and informed consent for medical services which was witnessed by Officer C. King. *Id.* at ¶ 4.  He also signed an inmate medical insurance information form agreeing to accept responsibility for his medical charges. *Id.*

On March 2nd Matthews submitted a request for medical attention. *Resp.* at ¶ 6.  He stated he needed to speak to the nurse and try to get his medical jacket from the Arkansas Department of Correction (ADC). *Id.*  He indicated he needed to get his mental health records so he could get some help. *Id.*  In response, Nurse Bradley advised him that he would need to have his lawyer contact the ADC to get his medical records. *Id.*

On March 2, 3, 4, and 5, Matthews submitted requests about the Fayetteville Police Department and wanting to bring charges against various individuals. *Resp.* at ¶ 8.  In response, he was provided the address of the Fayetteville Police Department and told to contact his attorney. *Id.*

On March 8th Matthews submitted a medical request asking for a copy of his "mental diagnosis" to help with his Supplement Security Income (SSI) application. *Resp.* at ¶ 10.  In response, he was told he could get SSI to get the records from the ADC. *Id.* at ¶ 11.

On March 11th Matthews was assigned to N block. *Resp.* at ¶ 12.  At approximately, 14:30 or 2:30 p.m., Deputy Greg Clark was in N block doing a count of inmates. *Resp.* at ¶ 13.

AO72A
(Rev. 8/82)

Deputies Kyle Hill and Matthew Dunham were also in N block. *Id.* Matthews indicates Deputy Steven Barker was also present. *Id.*

Matthews began yelling at Hill for taking his spoon. *Resp.* at ¶ 14(A). Hill and Dunham went to check for contraband in Matthews' cell. *Id.* Hill and Dunham were inside Matthews' cell and he stepped in front of the cell door blocking Hill and Dunham from leaving. *Id.* at ¶ 14(B). Matthews was advised to back away from the door. *Id.* at ¶ 14(C).

According to Dunham, Matthews took an aggressive stance with his fists clinched and did not back away. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 4 at page 2. Matthews, however, contends he backed up and stepped to his right. *Resp.* at ¶ 14(D).

Hill called over the radio for assistance in N block. *Resp.* at ¶ 15. Clark went upstairs to assist. *Id.* at ¶ 16.

Hill instructed Matthews to calm down, back up, and get out of the cell. *Resp.* at ¶ 17. Matthews became irate. *Resp.* at ¶ 18. Hill reached for his handcuffs. *Id.*

According to Clark, Matthews took his shirt off, threw it down, and stated he was not going to lock-down. *Defts' Ex.* 4 at page 1. Matthews admits he took his shirt off but states he did not refuse to go to lockup. *Resp.* at ¶ 19. Instead, he states he was trying to talk to Deputy Steven Barker. *Id.* Matthews states Barker indicated he couldn't make out what Matthews was saying. *Id.* Matthews maintains he was saying the two officers had done something wrong to him. *Id.*

According to defendants, Matthews continued to yell and Hill approached him and attempted to take him to the ground. *Defts' Ex.* 4 at page 1. Matthews, however, states he was

-3-

trying to talk to them and ask questions about the incident that was taking place. *Resp.* at ¶ 20. However, Matthews states Hill "reacted overly aggressively." *Id.*

Dunham and Clark assisted Hill in taking Matthews to the ground. *Defts' Ex.* 4 at page 1. Defendants indicate Matthews was instructed to stop resisting. *Id.* They maintain he ignored their instructions and continued to fight. *Id.* After about three minutes of fighting, defendants indicate Hill handcuffed Matthews. Clark, Dunham, and Hill escorted him out of the block and into M block. *Id.*

According to Matthews, he did not resist being restrained. *Resp.* at ¶ 21. However, he states that when he was being hurt to the point that the pain was unbearable and they were not letting up he did begin yelling. *Id.* Matthews asserts unnecessary force was used in taking him down, he was handcuffed roughly, and then taken to lock-down. *Id.* at ¶ 22.

Matthews was asked to describe in detail the amount of physical force used against him by Hill. Matthews responded:

> I was tackled down by Officer Hill very hard and my arm was pulled back extrem[e]ly hard. I was slammed to the floor very hard. I[t] was as if [he] was intentionally trying to hurt me instead of trying to restrain me.

*Resp.* at ¶ 63.

Matthews was also asked to describe in detail the amount of physical force used against him by Dunham. Matthews responded: "tackled me down and forced his knee in my back and pulled my arms the pain was very intense." *Resp.* at ¶ 64.

Following the altercation, Matthews indicates he was examined by Nurse Susan Johnson and given a shot for pain. *Resp.* at ¶ 38(a). He indicates his shoulder was out of place. *Id.* He

-4-

states Sgt. J. Fuller and D. Walker were present and took a photograph of his injuries.  *Id.  See also* Doc. 42 (response filed by plaintiff at page 18).

There is no indication in Matthews' medical file at the WCDC that he was seen by Nurse Johnson following the altercation on March 11th.  *Defts' Ex.* 2.  There is no mention in the medical file or in any of the records submitted by defendants of Matthews receiving medical treatment of any kind on March 11th.

The court clerk's file does contain a color photograph that was submitted by plaintiff with a motion to amend his complaint (Doc. 14).  The photograph was printed on a sheet of 8 ½ by 11 inch paper.  The paper appears to be ordinary copy paper.  Plaintiff indicates the photograph depicts his back.  Someone has drawn a black circle around a portion of the left shoulder area.  Within the area that is circled some redness and slight bruising can be noted.  There may also be some slight abrasions.  The picture, however, is of poor quality and the depicted injuries appear to be slight.

Officers Daniel Walker, Matthew Dunham, and Michael Cambron submitted incident reports regarding Matthews' refusal to obey the officers' orders and refusal to lock-down on March 11th.  *Resp.* at ¶ 23.  Matthews, however, asserts the officers were not honest when they stated he refused to obey orders to lock-down.  *Id.*

Inmate Cecil Southern filed a grievance stating that Matthews was six to eight feet away from Hill when he started yelling for help.  *Resp.* at ¶ 24.  In Southern's opinion, Hill did not know how to handle Matthews and Hill's behavior was unacceptable.  *Id.*

James Estes submitted a grievance stating that people didn't like being locked out and frustration manifested in what occurred that day.  *Resp.* at ¶ 25.  Clay Worthen submitted a

-5-

AO72A
(Rev. 8/82)

statement about the incident stating that Matthews was easily angered and Hill didn't treat inmates with enough respect and had a perception of power that produced an unfortunate situation.  *Id.* at ¶ 26.  David Garrert submitted a statement that they didn't need someone like Hill working at the detention center.  *Id.* at ¶ 27.

On March 12th, at 16:15 or approximately 4:15 p.m., when Dunham was passing out medication, Matthews asked Dunham where his partner was.  *Resp.* at ¶ 28.  When Dunham asked which partner Matthews was referring to he said the one Dunham was with yesterday.  *Id.* According to Dunham, Matthews then said it wasn't right what they did yesterday and "it's blood for blood now, you better not let me catch you sleeping!"  *Defts' Ex.* 4 at page 3.  Officers Dunham, Logue, and Conner all reported hearing Matthews make these statements.  *Resp.* at ¶ 30.

Matthews denies having made the statements.  *Resp. at* ¶ 29.  He asserts that "at no time did I make any comment like that."

On March 13th Nurse Moon was called to M block where Matthews was complaining of vomiting and a headache.  *Resp.* at ¶ 31.  She offered Matthews a phenergan suppository.  *Id.* He declined and was given two Pepto Bismol tablets.  *Id.*

On March 16th Matthews stated he intended to sue the detention center as a result of the incident on March 11th.  *Resp.* at ¶ 32.  On March 17th Matthews requested a copy of the picture taken of his back by Sgt. Fuller and wanted a copy of the report.  *Id.* at ¶ 33.  He said again he was going to sue.  *Id.*  He was told to write the U.S. Magistrate and given the address.  *Id.*

-6-

On March 17th Matthews stated he had eight pair of pants, eight shirts, and three coats, in his property that he wanted to mail back home. *Resp.* at ¶ 34.  In response, he was told to get a friend or family member to get his clothes. *Id.*

On March 18th Matthews requested a § 1983 form to start his case. *Resp.* at ¶ 35.  On March 18th Matthews requested pictures of his injury and copies of all statements. *Id.* at ¶ 36. In response, he was told they only provided copies of commitment papers and all other copies must be requested by his attorney. *Id.*

On March 20th Matthews requested the addresses of two attorneys, Doug Norwood and Dan Ivy. *Resp.* at ¶ 37.  The addresses were provided. *Id.*

On March 21st Matthews submitted a medical request. *Resp.* at ¶ 38(B).  He stated that every since the incident in N pod his left shoulder had been sore and hurting and his lower back was stiff and having muscle spasms. *Id.*

The March 21st request was the first written medical request Matthews submitted mentioning any injuries from the March 11th incident. *Resp.* at ¶ 38(C).  Matthews was seen by Nurse Bradley on March 22nd. *Id.* at ¶ 39.  She found he had normal range of motion and no deformities. *Id.*  She prescribed Ibuprofen, 600 mg., three times a day on an as needed basis for up to fourteen days. *Id.*  He received the Ibuprofen from March 22nd until April 4th. *Id.* at ¶ 40.

This is the only time he sought medical treatment following the March 11th incident. *Resp.* at ¶ 68.  The WCDC had jail nurses who made the decision as to whether or not detainees needed medical care. *Id.* at ¶ 67.

On March 22nd, Corporal Matthews submitted an incident report stating that Matthews did not have his armband on and did not line up for count. *Resp.* at ¶ 41.  Matthews indicated

-7-

another inmate Kevin Buchanan had his armband. *Id.* Matthews was told that he needed to wear his armband at all times and line up for count. *Id.* He complied. *Id.*

On March 22nd and March 26th Matthews submitted requests for legal envelops and notary services. *Resp.* at ¶ 42. He was provided envelops but told he would have to have his attorney or family arrange for the notary services. *Id.*

On March 30th Matthews requested that Dunham not work around him because of problems he had due to the pending lawsuit. *Resp.* at ¶ 43. Jail personnel noted the problem had been resolved. *Id.* Matthews was asked to state how the problem had been resolved. *Id.* Matthews responded that Dunham no longer worked around him. *Id.*

On March 30th Matthews requested the full names and badge numbers of the officers involved in his incident. *Resp.* at ¶ 44. He was told he only needed the last name to file grievances. *Id.* On March 31st Matthews asked for the full names of K. Hill and M. Dunham. *Id.* at ¶ 45. He was informed he would need to speak to Corporal Freeman who was handling the paperwork. *Id.*

On April 5th Matthews asked for information on his charges. *Resp.* at ¶ 46. He was provided the information. *Id.* On April 12th, 14th, and 17th, Matthews asked for legal envelops and for his legal papers back from Freeman. *Id.* at ¶ 47. He was provided with these materials. *Id.*

Matthews was released to the ADC on April 26th. *Resp.* at ¶ 48. He returned to the WCDC for court on May 9th. *Id.* at ¶ 49. He completed a medical questionnaire indicating he had no health problems other than the fact he was taking thorazine to treat depression. *Resp.* at ¶ 50 & ¶ 51.

AO72A
(Rev. 8/82)

Matthews submitted a grievance on May 12th in which he stated he was assaulted by Dunham and Hill on March 11th and would like to press charges against them. *Resp.* at ¶ 52. He indicated he also had a lawsuit pending against them. *Id.* In response Matthews was told if he had a lawsuit against the officers already "it will be taken care of then." *Id.* at ¶ 53.

On May 12th Matthews asked why he was being placed on lock-down. *Resp.* at ¶ 54. He asked if the jail had something against black people. *Id.* Sgt. Charles responded that Sgt. Wilson does not discriminate against any race and must have locked him down for his safety. *Id.* Matthews was told Sgt. Wilson would be back on Wednesday. *Id.*

On May 19th Matthews requested copies of legal papers sent from the prison, copies of photographs taken of his back after the incident on March 11th, and copies of the incident reports. *Resp.* at ¶ 55. In response, Matthews was told he could get that information through his attorney. *Id.* at ¶ 56.

On May 21st Matthews requested information regarding the March 11th incident including a document sent to Lt. Mitchell. *Resp.* at ¶ 57. Lt. Mitchell responded that he didn't have any such document and didn't have Matthews' paperwork. *Id.* at ¶ 58. Matthews was released back to the ADC on June 19th. *Id.* at ¶ 59.

Matthews ADC medical records make no mention of any injury allegedly caused by the March 11th incident at the jail. *Resp.* at ¶ 60. Matthews' intake physical on May 3, 2006, states he has no problems with his extremities other that surgery to his left forearm. *Id.* at ¶ 61. It is noted he has a firm grip and no atrophy of biceps. *Id.*

AO72A
(Rev. 8/82)

Matthews mentioned no specific problems with his back or shoulder during his intake physical.  *Resp.* at ¶ 62.  In the history portion Matthews did mention that he sometimes had recurrent back pain.  *Id.*

Matthews was asked to describe in detail any injuries he suffered as a result of the use of force against him on March 11th.  In doing so, he was asked to describe in detail:  (a) the physical injuries he suffered; (b) the symptoms he experienced; (c) whether he sought, or received, medical treatment as a result of the injuries; and (d) how long it took him to recover from the injuries.  Matthews responded:

> I have a knot under my arm and it really affected me mentally.  My mental health medical have went up.  I don't know how long it will take me to recover.  I was very afraid that they were going to harm me until I couldn't move or anything.  My face was pushed to the floor very hard also.  I hav[e]n't recovered from my injury yet.  Also have pain in shoulder at time[s].

*Resp.* at ¶ 65.

## Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

-10-

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment.  First they contend they have been sued in their official capacities only.  As Matthews cannot prove an unconstitutional county policy led to the violation of his constitutional rights, they maintain they are entitled to judgment as a matter of law.  Second, if the complaint is construed to be asserting individual capacities claims against them, they maintain the force employed was objectively reasonable under the circumstances.

### *Official Capacity v. Individual Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).   The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.

-11-

*Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*,

474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official

capacity, or claims may be stated against a defendant in both his individual and his official

capacities.  In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the

distinction between individual and official capacity suits.  As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those
> in their official capacities as to the type of conduct that is actionable and as to the
> type of defense that is available.  *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358,
> 116 L. Ed. 2d 301 (1991).  Claims against individuals in their official capacities
> are equivalent to claims against the entity for which they work; they require proof
> that a policy or custom of the entity violated the plaintiff's rights, and the only
> type of immunity available is one belonging to the entity itself.  *Id.* 502 U.S. at
> 24-27, 112 S. Ct. at 361-62 (1991).  Personal capacity claims, on the other hand,
> are those which allege personal liability for individual actions by officials in the
> course of their duties; these claims do not require proof of any policy and
> qualified immunity may be raised as a defense.  *Id.* 502 U.S. at 25-27, 112 S. Ct.
> at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents

are being sued in their official or individual capacities to ensure prompt notice of potential

personal liability.  *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989).  *See also Andrus v.

Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual

capacity is required to put public officials on notice they will be exposed to personal liability).

When the plaintiff fails to state whether he is suing an official in his individual capacity, the

Eighth Circuit has construed the claim to be against the official in his official capacity only.  *See

Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public

-12-

official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

At the same time, we are charged with liberally construing pro se complaints. *See e.g. Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)(requirement that pro se complaints be construed even more liberally than counseled pleadings); *White v. Wyrick*, 530 F.2d 818, 819 (8th Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief"). *See also, Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997)(complaint against state officials who were sued in their official capacities was deemed amended to assert personal capacity claims, where plaintiff moved to amend complaint in response to motion for summary judgment). In responding to the summary judgment motion, Matthews has noted that he intended to sue the defendants in both their individual and official capacities. *Resp.* at ¶ 69. We will therefore construe the complaint to be asserting both individual and official capacities claims.

### Excessive Force Claim

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

-13-

"[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, Matthews was a pre-trial detainee . In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency.   As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

-14-

In this case, Matthews and the defendants give somewhat contradictory versions of what happened on March 11th.  All agree that Matthews began yelling at Hill for taking his spoon.  *Resp.* at ¶ 14(A).  Matthews also agrees that he stepped in front of the cell door and blocked Hill and Dunham from leaving.  *Resp.* at ¶ 14(B).  However, it is at this point their stories diverge somewhat.  Matthews contends that when ordered to do so he backed up and stepped to his right.  *Id.* at ¶ 14(D).  Defendants maintain Matthews took an aggressive stance, clinched his fists, and did not back away.  *Defts' Ex.* 4 at page 2.

Matthews agrees he was irate.  *Resp.* at ¶ 18.  He also agrees that when Hill reached for his handcuffs he took off his shirt and threw it down.  *Id.* at ¶ 19.

Although Matthews submitted numerous grievances on a number of topics including the March 11th incident, he did not mention the injuries he sustained in the alleged use of force.  Matthews sought medical care for these injuries on only one occasion following the March 11th incident and received Ibuprofen.  After he was transferred to the ADC, he did not seek any additional medical treatment for injuries stemming from this incident.  This belies his assertions regarding both the degree of force used and the extent of injuries suffered during the incident.  *See Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994)(proper to consider the lack or minor degree of injury in excessive force cases).

We conclude there is no genuine issue of fact as to whether defendants' actions were objectively reasonable in light of the facts and circumstances confronting them.  It is undisputed that Matthews was yelling at the officers, *resp.* at ¶ 14(A), stepped in front of the cell door blocking them from leaving, *resp.* at ¶ 14(B), was irate, *resp.* at  ¶ 18, took his shirt off, and

-15-

threw it to the ground, *resp.* at ¶ 19, and continued to question the officers' actions, *resp.* at ¶ 20.

It was therefore reasonable for the defendants to use some force in taking Matthews to the ground, handcuffing him, and escorting him out of the block.  The force used including was not so unreasonable as to give rise to a constitutional claim of excessive force under the Fourth Amendment.  *See e.g., Foster v. Metropolitan Airports Com'n*, 914 F.2d 1076, 1082 (8th Cir. 1990)(pushed into the wall twice on the way to the holding area not sufficient to give rise to a constitutional claim where no injury sustained).

### Conclusion

For the reasons stated, defendants summary judgment motions (Doc. 33 and 45) will be granted by a separate order entered this same day.

DATED this 5th day of February 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-16-